UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-----------------------------------------------------------------

NEW YORK SMSA LIMITED PARTNERSHIP,
d/b/a, VERIZON WIRELESS,

                  Plaintiff,

          v.

TOWN OF OYSTER BAY and TOWN OF
OYSTER BAY ZONING BOARD OF APPEALS,

                  Defendants.

-----------------------------------------------------------------

**<u>MEMORANDUM & ORDER</u>**

11-CV-3077 (MKB)

MARGO K. BRODIE, United States District Judge:

Plaintiff New York SMSA Limited Partnership doing business as Verizon Wireless

("Verizon Wireless") brings the above-captioned action against Defendants Town of Oyster Bay

and the Town of Oyster Bay Zoning Board (the "Board") pursuant to the Telecommunications

Act of 1996 ("TCA") and Article 78 of the New York Civil Practice Law and Rules ("Article

78"). Plaintiff asserts that Defendants unlawfully rejected its application for a special use permit

to build a wireless facility in a church located in East Norwich. Plaintiff moves for summary

judgment and requests that this Court order the Board to issue the special use permit. The Court

heard oral argument on July 12, 2013. For the reasons set forth below, the Court grants

Plaintiff's motion.

## I. Background

### a. Statutory Scheme

Under the TCA, Congress "preserved the authority of state and local governments over

zoning and land use issues, but imposed limitations on that authority." *N.Y. SMSA Ltd. P'ship v.*

*Town of Clarkstown*, 612 F.3d 97, 101 (2d Cir. 2010) (citing 47 U.S.C. § 332(c)(7)).  Congress specified in the TCA that:

> Except as provided in this paragraph, nothing in this chapter shall limit or affect the authority of a State or local government or instrumentality thereof over decisions regarding the placement, construction, and modification of personal wireless service facilities.

*N.Y. SMSA Ltd. P'ship*, 612 F.3d at 101 (quoting 47 U.S.C. § 332(c)(7)(A)); *see also New Cingular Wireless PCS, LLC v. Town of Fenton*, 843 F. Supp. 2d 236, 245 (N.D.N.Y. 2012) ("While '[t]he TCA clearly establishes procedural requirements that local boards must comply with in evaluating cell site applications[,]' the applicable substantive standards to be applied are derived from the established principles of local and state zoning laws." (quoting *Cellular Tel. Co. v. Town of Oyster Bay*, 166 F.3d 490, 494 (2d Cir. 1999))); *N.Y. SMSA Ltd. P'ship v. Vill. Of Floral Park Bd. Of Trs.*, 812 F. Supp. 2d 143, 155 (E.D.N.Y. 2011) ("[W]hile the TCA governs the 'procedural requirements that local boards must comply with in evaluating cell site applications' the applicable substantive standards are the 'established principles of state and local law.'").

Congress limited "the traditional authority of state and local governments to regulate the location, construction, and modification of [facilities for wireless communications]."  *Rancho Palos Verdes v. Abrams*, 544 U.S. 113, 115 (2005); *see also Sprint Spectrum L.P. v. Willoth*, 176 F.3d 630, 637 (2d Cir. 1999) (finding that Congress limited "the state and local government's authority to deny construction of wireless telecommunications towers, and regulates how such decisions must be made." (citations omitted)); *City of Arlington, Tex. v. F.C.C.*, 569 U.S. ---, ---, 133 S. Ct. 1863, 1866 (2013) (citing *Rancho Palos Verdes*, 544 U.S. at 115); *Omnipoint Commc'ns, Inc. v. City of White Plains*, 430 F.3d 529, 531 (2d Cir. 2005) ("The TCA limits state

and local regulation 'of the placement, construction, and modification of personal wireless service facilities.'" (quoting 47 U.S.C. § 332(c)(7))).

Section 332(c)(7) of the TCA specifies certain limitations on the authority of state and local government. According to this provision, state and "local governments may not 'unreasonably discriminate among providers of functionally equivalent services,' take actions that 'prohibit or have the effect of prohibiting the provision of personal wireless services,' or limit the placement of wireless facilities 'on the basis of the environmental effects of radio frequency emissions.'" *Rancho Palos Verdes*, 544 U.S. at 116 (quoting 47 U.S.C. § 332(c)(7)(B)(i)(I), (II) and (IV)); *see also N.Y. SMSA Ltd. P'ship*, 612 F.3d at 101 ("In section 332(c)(7) of the [TCA], Congress preserved the authority of state and local governments over zoning and land use issues, but imposed limitations on that authority); *Omnipoint Commc'ns*, 430 F.3d at 531("The TCA limits state and local regulation 'of the placement, construction, and modification of personal wireless service facilities.'"); *Sprint Spectrum L.P.*, 176 F.3d at 637 ("Congress enacted [TCA § 332(c)(7)] which limits the state and local government's authority to deny construction of wireless communications towers, and regulates how such decisions must be made." (citations omitted)).

The TCA further requires state and local governments to act "within a reasonable period of time after the request is duly filed . . . ." 47 U.S.C. § 332(c)(7)(B)(ii); *see also Omnipoint Commc'ns*, 430 F.3d at 531 ("state and local governments must act on applications 'within a reasonable period of time . . . .'"); *Rancho Palos Verdes*, 544 U.S. at 116 (same). Any "denial of a request to build wireless facilities must be 'in writing and supported by substantial evidence contained in a written record,' and not contrary to the limits on town authority set forth in" the TCA. *Sprint Spectrum L.P.*, 176 F.3d at 638; *see also Omnipoint Commc'ns*, 430 F.3d at 531.

The act allows "[a]ny person adversely affected by any final action or failure to act by a State or local government or any instrumentality thereof" that is inconsistent with TCA to "within 30 days after such action or failure to act, commence an action in any court of competent jurisdiction." *Rancho Palos Verdes*, 544 U.S. at 116 (quoting 47 U.S.C. § 332(c)(7)(B)(v)). These decisions are closely reviewed by the courts:

> Although the TCA preserves local zoning authority in all other respects over the siting of wireless facilities, "the method by which siting decisions are made is now subject to judicial oversight. Therefore, denials subject to the TCA are reviewed by this court more closely" than are other types of zoning decisions to which federal courts generally accord great deference.

*Sprint Spectrum*, 176 F.3d at 637; *see also N.Y. SMSA Ltd. P'ship*, 612 F.3d at 101; *Omnipoint Commc'ns*, 430 F.3d at 531.

A plaintiff may also bring an action under Article 78 for the denial of use permit in federal court. *T-Mobile Ne. LLC v. Town of Islip*, 893 F. Supp. 2d 338, 373 (E.D.N.Y. 2012) ("Although 'Article 78 imposes its own requirement that local decisions be supported by substantial evidence' the test for relief from a zoning board's decision under Article 78 'is essentially the same as that under the TCA.'" (citations omitted)); *Town of Fenton*, 843 F. Supp. 2d at 253 (hearing denial of permit claims both under TCA and Article 78); *Vill. of Floral Park Bd. of Trs.*, 812 F. Supp. 2d at 166–67 (same); *MetroPCS N.Y., LLC v. Vill. of E. Hills*, 764 F. Supp. 2d 441, 448–49 (E.D.N.Y. 2011) (same).

### b. Use Permit Application

Plaintiff sought a use permit "to construct, operate and maintain a public wireless communication facility consisting of six (6) wireless panel antennas behind new radio frequency transparent louvers within [the] steeple of [an] existing church building, an equipment area secured with an 8 ft. high chain lin[k] fence within [the] basement of [the] church building, [an]

emergency back up natural gas generator with sound enclosure on rooftop of [the] church building, two (2) global positioning satellite (GPS) units to generator [sic] support framing, along with all other related structures, equipment, devices and cables" (the "proposed facility").[1] (R. 0003.)  In addition to the church, there is a preschool located at the site.  (*Id.* at 0004–0005.) According to Plaintiff, the wireless facility would be unmanned.  (*Id.* at 0022.)  A service person would check on the facility every four to six weeks to make sure it was functioning properly. (*Id.*)

The roof of the church has three layers — "lower roof level, interior immediate roof level, and then the peak of the church" — and the emergency backup generator (the "generator") would have been placed on "the interior immediate level of the roof."  (*Id.* at 0020.)  According to the plans submitted by Plaintiff, the generator would have been three feet and eight inches above the top of the intermediate level roof.   (Pl. 56.1 ¶ 45.)

Plaintiff asserts that the special use permit was needed to remedy a gap in service and that the site would remedy the gap in a 2.06 square miles area.  (R. 0013.)  According to Plaintiff, this area includes Route 106, which services 27,267 cars a day.  (*Id.*)

### c.  Building Department Application

Plaintiff filed an application for a building permit on December 30, 2009, with the Town of Oyster Bay Building Department (the "Building Department").  (*Id.* at 0356.)  The Building Department denied the application on the grounds that Plaintiff was "required to obtain a special use permit from the Board pursuant to § 245 – 5.5.9.3.1 of the Town Code."  (*Id.*; Pl. 56.1 ¶ 53.)

---

[1] Plaintiff had the permission and support of the church for its application.  (*See* R. 0060–0062.)

### d. Zoning Board of Appeals' Proceeding

Plaintiff submitted an application to the Board on August 11, 2010, seeking a special use permit. (Pl. 56.1 ¶ 53.) A public hearing on the special use permit was conducted at 7:00 P.M. on December 2, 2010 (the "Hearing") before the Board. (R. 0003.) At the Hearing, Plaintiff's counsel testified on Plaintiff's behalf regarding the need for the special use permit to rectify a service gap which included Route 106. (*Id.* at 0013.) In addition to counsel, Plaintiff presented the testimony of five expert witnesses, whose reports were entered into the record at the Hearing. (*Id.* at 0016–0017.) Counsel also entered into evidence at the Hearing expert reports of non-testifying experts, as well as the testimony of a member of the church where Plaintiff proposed to build the facility and a list of church attendees who supported the plan. (*Id.* at 0040, 0044–0045, 0059–0062.) The Board also heard from several members of the community who opposed the special use permit. (*Id.* at 0045–0055.)

### i. Evidence Presented by Plaintiff

Daniel Felasco, a licensed engineer who had appeared before the Board in the past and was recognized by the Board as an expert, testified on behalf of Plaintiff about the facility and the general design. (*Id.* at 0016–0023.) Erin Echeveria from VHB Engineering, Surveying and Landscape Architecture, P.C. discussed the aesthetics, planning and environmental aspects of the application. (*Id.* at 0016, 0023–0026.) VHB submitted visual simulations of the proposed facility. (*Id.*) Echeveria testified that based on her report and simulation, the proposed alterations would "not [be] visible from certain locations within the neighborhood." (*Id.* at 0024.) She testified that the generator was visible from some vantage points, but Plaintiff's plan was to paint the generator black to blend with the roof top. (*Id.* at 0025.) Echeveria's expert opinion was that "there would be no significant impact to the character of the church or the

neighborhood." (*Id.*) Louis Cornacchia of Synectics Corporation, a health and safety expert, who had testified before the Board many times and was recognized by the Board as an expert, discussed and explained how the application complied with Federal Communications Commission ("FCC") guidelines for emissions. (*Id.* at 0016–00017, 0026–0030.) Anthony West of C Squared Systems LLC, a Radio Frequency ("RF") engineer, discussed the service gap, which was one mile on Route 106 and included portions of Muttontown Preserve, which has no homes, as well as a residential area. (*Id.* at 0016–0017, 0030–0036.) West testified that in some of the covered area, calls could be made in some locations but the service was not reliable. (*Id.* at 0035.) West did not testify to the alternative locations considered by Plaintiff because, according to counsel, West was only involved in the analysis of some, but not all, of the other sites and another expert had submitted a report about alternative locations. (*Id.* at 0036–0037.) Thus, counsel gave the Board an overview of the alternative locations considered by Plaintiff. (*Id.* at 0036–0040.) Charlie Kuchenbrod, the expert who researched all the sites, was at the Hearing but submitted an affidavit instead of testifying. (*Id.* at 0040.) Counsel did inform the Board that Kuchenbrod was available for questioning. (*Id.*) Kuchenbrod's Affidavit presented sworn statements concerning his efforts on behalf of Plaintiff to investigate potential locations for a wireless facility, including Rothmann's Steakhouse and East Norwich Inn. (*Id.* at 0064–0070.) Plaintiff also presented the testimony of Michael Lynch, a certified appraiser who had appeared before the Board on many prior occasions and was recognized by the Board as a real estate expert. (*Id.* at 0042–0044.) Lynch testified that the application would not impact real estate property values because it was concealed. (*Id.* at 0016–0017, 0041–0044.) Lynch based his expert opinion on the study of a T-Mobile antenna site in a church in East Norwhich which was built in 2000. (*Id.*)

### ii. Testimony of Community Members

John Robertson testified that he lived in the neighborhood and was opposed to the proposed facility because it was visible, he had concerns about the health impacts of the facility, and there was no service problem since he had a Verizon Wireless telephone and he had no problems with service. (*Id.* at 0045–0048.) Patrick Gunther testified that he lived across the street from the church and was opposed to the proposed facility because it was unhealthy, the neighborhood was residential, and the structure would be visible and may make noise. (*Id.* at 0048–0051.) He also testified that he had Verizon Wireless service and never experienced a gap in service. (*Id.*) Gunther was also concerned that if Plaintiff was allowed to use the church, other carriers would seek to use the church for similar purposes. (*Id.*) Vincent Fortilisi testified that he was worried about the health effects of the proposed facility. (*Id.* at 0051–0052.) Joe Diagami testified that he lived in the neighborhood and was also concerned about the health effects of the proposed facility. (*Id.* at 0052–0054.) Donald Jami testified that the target was the 27,000 drivers who use Route 106 and since talking on cellular telephones while driving is illegal in New York, he implied that it was not necessary to provide service. (*Id.* at 0054–0055.) Jami also noted that property values were very different than they were in 2000. (*Id.*)

### iii. Additional Evidence

Echeveria provided additional testimony in response to the testimony from the community members. (*Id.* at 0055–0056.) She testified that while the generator would make noise, it would be at 51 decibels and because the average general noise in the community was 58 decibels, the generator would not have "a significant impact to the ambient noise level in the area." (*Id.*)

Counsel told the Board that if there was a problem with the generator, Plaintiff would be willing to remove the generator. (*Id.* at 0057.) The Board asked if an alternative to the generator could be considered, such as something in the basement or inside another portion of the building, given the Board's past experience with other requests where smaller generators that employed battery packs were used in the interiors of facilities. (*Id.* 0057–0058.) Counsel told the Board that if Plaintiff was going to have an emergency backup generator onsite, it would have to be an exterior generator. (*Id.* at 0059.)

Kathy Nastri, a member of the church who lived in the neighborhood, testified on its behalf. (*Id.* at 0060–0062.) She testified that the church supported the plan because of the financial difficulties that the church had been experiencing. (*Id.*)

### e. The Board's Decision

The Board denied Plaintiff's application for a special use permit. The Board based its decision on "numerous site inspections and investigation, as well as listening to all of the testimony at [the Hearing], and conducting an in-depth review of all exhibits, affidavits and reports submitted to the Board and based on the Board members' own personal knowledge of the premises and inspection [of] the site and surrounding neighborhood. . . ." (R. 0003.)

The Board considered whether the application for the special use permit was consistent with Section 9.4 of Town of Oyster Bay Zoning Code which governs special use permits. The introduction states:

> All special permit uses shall comply with the following standards, in addition to any other applicable requirements of this chapter and to all other applicable federal, state, county and local laws, ordinances, rules and regulations. The approving agency, if it acts to approve a special use permit application, shall attach such additional conditions, restrictions, safeguards and required modifications to the special use permit as are, in its sole discretion, necessary to ensure both initial and continued conformance to all

applicable standards, requirements and purposes of this chapter. A special use permit shall also conform to the regulations of the zoning district in which the use is located.

(§ 9.4 Town of Oyster Bay Zoning Code.)  The Board first considered Section 9.4.1 of Town of

Oyster Bay Zoning Code which states:

> The proposed location and size of the special permit use, the nature and intensity of the operations involved in it or conducted in connection with it, the height, bulk, density, architecture and orientation of proposed structures, the size of the site in relation to it, the character of the district in which it is located, the location of the site with respect to places of worship, schools, recreation areas or other places of public assembly and the location of the site with respect to streets giving access to it shall be such that it will be in harmony, both visually and otherwise, with the appropriate and orderly development of other properties in the area in which it is located, consistent with any plan or plans which may have been duly adopted by the Town Board for the hamlet or other geographic area in which the use will be located, and consistent with the purposes and intent of this chapter.

(§ 9.4.1. Town of Oyster Bay Zoning Code.)  A church is a permitted use in a residential

neighborhood, and the Board found that "[t]he Church in question is over one hundred (100)

years old."  (R. 0004.)  The Board also noted that "[t]he existing building is used as a place of

worship within a residential neighborhood and the attached structure to this church is a pre-

school with children ranging from the ages of 2–5."  (*Id.*)  The Board noted that while there are

two roads nearby with commercial buildings, "once entering the subject area, it is completely

residential, and has been that way for decades, and is shielded from commercial uses."  (*Id.*)  The

Board found that "the nature and intensity of the operations involved in [the proposed

application], and the orientation of the proposed structures does not conform to the character of

the district in which it is located."  (*Id.*)  The Board found that the proposed special use permit

was "clearly not in harmony with the appropriate and orderly development of the area in which it

is located."  (*Id.*)

The Board also found that given the generator's location on the roof, the design was not stealth and was "an over-intensification of use." (*Id.* at 0005.) The Board specifically found that:

> [T]he proximity of this proposed use to places of public assembly is a huge consideration for this Board. The rooftop generator is completely visible to the neighborhood and in fact it extends approximately 5 (five) feet over the roof ridge line on which it sits.[2] Furthermore, there is no practical way to buffer or screen it.[3] Applicant's answer is to paint it black. The Board members have done site inspections and have noted that the roof in question is not black and that the rooftop generator is not something that will be "stealth" to the naked eye. New York's Dictionary defines "Stealth" as "secret, furtive, or artfully sly action or behavior". Certainly, in this case the facility does not fit this definition. The Board also believes that it is preposterous to consider the installation of an Eight (8) foot high chain link fence in the basement of the church to encase applicant's equipment cabinets. It begs the question why this fence is needed.

(*Id.*)

The Board then considered the special use application in relation to Section 9.4.2 of Town of Oyster Bay Zoning Code, which states:

> The physical characteristics of the site, including its soils, vegetation, topography, wetlands and other environmental features and physical characteristics, shall be such that the land will be suitable and conducive to the orderly, safe and appropriate development of the proposed special permit use, including its proposed design and location on the site, its proper buffering from surrounding properties and land uses, and the protection provided for environmental features, including wetlands, steep slopes, and important vegetation, especially mature woodlands and specimen trees.

---

[2] The Board stated in its decision that the generator would be "five feet over the roof ridge line on which it sits." (R. 0005.) However, this conclusion is not supported by any testimony or other documents in the record.

[3] Plaintiff asserts that pursuant to plans submitted to the Board that it was clear that there would be a buffer. (Pl. Mem. 15.)

(§ 9.4.2 of Town of Oyster Bay Zoning Code.)  The Board reiterated that the generator would not have "real adequate buffering."  (R. 0005.)  The Board further noted that while Plaintiff's counsel offered to remove the generator from the application if it was a problem, "[c]ounsel later testified that 100% of these Verizon facilities have exterior generators and did not withdraw that part of the application."  (*Id.*)  The Board, therefore, concluded that the generator must be considered part of the application.  (*Id.*)

The Board then considered Section 9.4.3 of Town of Oyster Bay Zoning Code, which states:

> The proposed special permit use, including its design and location on the site, will not create a hazard to life, limb or property because of fire, flood, erosion or panic, or by its inaccessibility for the safe and convenient entry and operation of fire and other emergency apparatus, or by the overcrowding of land or undue concentration or assemblage of persons within such or upon such property.

(§ 9.4.3. Town of Oyster Bay Zoning Code.)  The Board found that this provision had not been met since there was no adequate emergency plan for the proposed facility.  (R. 0005.)  The Board found the lack of an emergency plan "especially . . . regarding the equipment proposed in the Church's basement that will be behind an Eight (8) foot high locked chain fence."  (*Id.* at 0005– 0006.)

The Board also considered Section 9.4.5 of Town of Oyster Bay Zoning Code which states:

> The location, nature and height of buildings, walls and fences and the nature and extent of existing or proposed plantings, including buffer screening, on the site shall be such that the special permit use will not hinder or discourage the appropriate development and use of adjacent land and buildings nor will it impair the value thereof.

(§ 9.4.5 Town of Oyster Bay Zoning Code.)  The Board found that Plaintiff ignored this requirement entirely and mistakenly represented that there "were no buildings or fencing proposed," since it was "clear that the proposed gas generator atop the Church's roof [would be] an extension of the building itself."  (R. 0006.)  The Board stated that "considering the location of the generator, the building's new height on the roof and the proximity to the residences, the Board finds that this absolutely is a hindrance to the appropriate development and use of adjacent land."  (*Id.*)  It found that the generator would be "directly in the line of sight of the residences across from it."  (*Id.*)  The Board found that the generator coupled with the fencing on the interior would change the "nature of the use of the existing building."  (*Id.*)  The Board asserted that this change in use would affect property values.  (*Id.*)  The Board found the report of the Plaintiff's real estate expert to be unpersuasive because "he [did] not support [the report] with any statistical data other than a similar application in Suffolk County that was installed over ten (10) years ago."  (*Id.*)  The Board determined that, therefore, "there [was] not sufficient analysis to prove that the property values will not be impacted."  (*Id.*)  The Board also discounted the expert's opinion that the design was "stealth" and that prospective buyers would be unaware of its presence.  (*Id.*)  The Board stated that it could not "rely on 'what-ifs' when rendering its decision."  (*Id.*)  Further, the Board found that based on the current real estate market, "there should not be an assumption made in any analysis that because 'prospective buyer' may or may not see it, it will not know it is there and therefore it will not affect values."  (*Id.*)

Section 9.4.6 of Town of Oyster Bay Zoning Code relates to "noise, traffic, fumes, vibration or other characteristics than would be the operations and impacts of permitted uses not requiring a special use permit in that zoning district."  (*Id.* at 0007.)  The Board noted that concerns about the proximity of the generator to homes had been raised.

Section 9.4.8. of the Town of Oyster Bay Zoning pertains to the limitations of smoke, gas, dust, odors, noise, waste, vibration, heat, electromagnetic interference, fire, radiation and traffic. (*Id.* at 0008.) The Board found that Plaintiff failed this requirement because other than a report about electromagnetic interference, there was no actual analysis about the standards other than "boilerplate language" in Plaintiff's general report. (*Id.*) The Board asserted that Plaintiff had the burden to produce evidence that it met these standards, a burden which Plaintiff failed to meet when it failed to provide the Board with the relevant analysis. (*Id.*)

The Board found that there was not enough information in the record to determine whether the special use permit met Section 9.4.13 of Town of Oyster Bay Zoning Code. Section 9.4.13 states that "[t]he operation of the proposed special permit use shall not overburden or otherwise interfere with the orderly enjoyment of neighboring parks, recreational facilities or other public facilities." (§ 9.4.13 Town of Oyster Bay Zoning Code.)

The Board next considered whether Section 9.4.14 of Town of Oyster Bay Zoning Code was implicated, which states: "The safety, health, welfare, comfort, convenience and order of the Town will not be adversely affected by the proposed special permit use and its proposed location on the site." (§ 9.4.14 Town of Oyster Bay Zoning Code.) The Board found that based on the "public testimony" at the Hearing, this provision was implicated. (R. 0009.) "The residents surrounding that area were strongly opposed to the proposed use and none testified that they had any problems with their cellular coverage." (*Id.*) The residents also "testified that they were extremely concerned with the long-term effects of the radio frequency emissions and were visibly affected by the unknown." (*Id.*) The Board went on to note that under the TCA, the Board "cannot consider the impact of the radio frequency emissions if they are within the safety criteria" set out by the TCA but it could "consider the adverse effect on the order of the Town."

(*Id.*)  The Board found that "the order in this residential neighborhood [would] be detrimentally impacted by the proposed use."  (*Id.*)  The Board noted that adding another commercial use, in addition to the pre-school, would "set an unwanted precedent in this neighborhood" that would lead to negative effects on "safety, health, welfare, comfort, convenience and order of the Town."  (*Id.*)

The Board then considered whether the proposed use would "provide economic benefits to the Town and its residents, and at the same time, [would] avoid adverse economic impacts of other existing uses pursuant to Section 9.4.15 of Town of Oyster Bay Zoning Code.  (*Id.*)  The Board found "that there [was] absolutely no economic benefit to the Town and its residents if this application is granted." [4]  (*Id.*)  The Board again emphasized that Plaintiff "failed to show how this application [would] avoid adverse economic impacts on the value of the residences surrounding it." [5]  (*Id.*)

The Board considered whether the application was in line with Section 5.5.9 of Town of Oyster Bay Zoning Code, which states:

> The applicant shall also prepare and submit a study which demonstrates a public need for each such tower based upon an area service plan which minimizes the number of such facilities within the Town, maximizes co-location and shared use of existing or proposed towers and analyzes alternatives which may be available to minimize visual impacts and exposure levels.

(§ 5.5.9.3.2 of Town of Oyster Bay Zoning Code.)  The Board found that this standard was not met since there was no need for a wireless tower in that location and that Plaintiff had "not

---

[4]  The Board did not acknowledge the testimony of the church member, who lived in the neighborhood, that the application would be an economic benefit to the church.

[5]  The Board found that Sections 9.4.4, 9.4.7, 9.4.10, 9.4.11 and 9.4.12 of Town of Oyster Bay Zoning Code did not apply to the proposed special use permit.

sufficiently done due diligence in maximizing co-location and shared use of existing or proposed towers." (R. 0010.) The Board discredited the Plaintiff's expert report, which stated that there was a service gap in the area, because the Board found "that the models used in the . . . report are not accurate representation of the service in the area and that the height of said Church is not suitable for providing seamless and reliable grade of service to the public." (*Id.*) The Board did not support this assertion with contrary models for the relevant service area. (*Id.*) The Board found that based on its own investigation, the gap occurred "1.86 miles south of the site in question." (*Id.*) The Board conducted its own analysis "using cell service while in the area." (*Id.*) The Board noted that "most of the area directly to the South and Southeast of the site is occupied by the Muttontown Preserve where there is scarcely any traffic or residential neighborhood that would be using cellular service." (*Id.* at 0011.)

As to alternative locations, the Board stated that of the eight existing sites in the proposed area, the church was the shortest by 27.5 feet. (*Id.*) The Board noted that Plaintiff never considered two of the possible alternative sites, Rothmann's Steakhouse and East Norwich Inn, because Plaintiff failed to conduct any due diligence. (*Id.*) The Board found that Plaintiff merely sent the owners an unreturned letter, which was not sufficient to meet Plaintiff's due diligence. (*Id.*) The Board opined that the "Rothmann's Steakhouse" site would have been "more ideal as it is located in a much more commercially oriented area" and "it would have more than satisfied the height requirements." (*Id.*)

## II. Discussion

### a. Standard of Review

#### i. Summary Judgment

Summary judgment is proper only when, construing the evidence in the light most favorable to the non-movant, "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Kwong v. Bloomberg*, --- F.3d ---, ----, 2013 WL 3388446, at *4 (2d Cir. July 9, 2013); *Redd v. N.Y. Div. of Parole*, 678 F.3d 166, 174 (2d Cir. 2012). The role of the court is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Cioffi v. Averill Park Cent. Sch. Dist. Bd. of Educ.*, 444 F.3d 158, 162 (2d Cir. 2006) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)). A genuine issue of fact exists when there is sufficient "evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252. The "mere existence of a scintilla of evidence" is not sufficient to defeat summary judgment; "there must be evidence on which the jury could reasonably find for the plaintiff." *Id.* The court's function is to decide "whether, after resolving all ambiguities and drawing all inferences in favor of the non-moving party, a rational juror could find in favor of that party." *Pinto v. Allstate Ins. Co.*, 221 F.3d 394, 398 (2d Cir. 2000).

#### ii. Telecommunications Act Review Standard

Under the TCA, a denial of an application must be in writing and supported by substantial evidence in the record. *Sprint Spectrum L.P.*, 176 F.3d at 640; *see Omnipoint Commc'ns, Inc. v. Town of LaGrange*, 658 F. Supp. 2d 539, 554 (S.D.N.Y. 2009) (finding that the decision must "link[] [the authority's] conclusions to evidence in the record. Otherwise, [a] court would have to wade through the record below in an attempt to discern the [zoning

authority's] rationale."  (alteration in original) (citations omitted)).  A court must review the zoning board's written opinion in light of the entire record to determine if it is supported by substantial evidence.  *Sprint Spectrum L.P.*, 176 F.3d at 638 ("Substantial evidence requires evaluation of the entire record, including opposing evidence . . . ." (citations omitted)); *Town of Fenton*, 843 F. Supp. 2d at 244–45 ("However, the record should be viewed in its entirety, including evidence opposed to the Town's view."); *Town of LaGrange*, 658 F. Supp. 2d at 554–55 ("[T]he record should be viewed in its entirety, including evidence opposed to the Town's view.").  A decision by a local zoning board will be upheld if it is supported by substantial evidence.  *Vill. of Floral Park Bd. of Trs.*, 812 F. Supp. 2d at 154 ("If the Court finds that even one reason given for the denial is supported by substantial evidence, the decision of the local zoning body cannot be disturbed." (alteration and citations omitted)); *see also Omnipoint Commc'ns*, 430 F.3d at 531 (upholding the zoning board's decision because it "was supported by substantial evidence").

"Whether a decision is supported by substantial evidence must be determined according to the traditional standard used for judicial review of agency actions."  *Sprint Spectrum L.P.*, 176 F.3d at 638 (citations and internal quotation marks omitted).  "Substantial evidence, in the usual context, has been construed to mean less than a preponderance, but more than a scintilla of evidence."  *Omnipoint Commc'ns*, 430 F.3d at 533 (alterations in original) (quoting *Cellular Tel.*, 166 F.3d at 494); *see also Sprint Spectrum L.P.*, 176 F.3d at 638 ("Substantial evidence requires . . . a decision to be supported by 'less than a preponderance but more than a scintilla of evidence.'" (citations omitted)).  "It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Sprint Spectrum L.P.*, 176 F.3d at 638 (citations and internal quotation marks omitted); *see also Vill. of Floral Park Bd. of Trs.*, 812 F. Supp. 2d

at 153. "As a general rule, if the public utility makes the required showing, which necessarily means the record is devoid of substantial evidence to support a denial, the variance must issue." *Town of Islip*, 893 F. Supp. 2d at 355; *see also Town of LaGrange*, 658 F. Supp. 2d at 553–54. "On the other hand, '[i]f the Court finds that even one reason given for the denial is supported by substantial evidence, the decision of the local zoning body cannot be disturbed.'" *Town of Islip*, 893 F. Supp. 2d at 355.

It "is a deferential standard, and courts 'may neither engage in [their] own fact-finding nor supplant the [ ] Board's reasonable determinations. . . .'" *Omnipoint Commc'ns*, 430 F.3d at 533 (alterations in original) (quoting *Cellular Tel. Co.*, 166 F.3d at 494); *Town of Fenton*, 843 F. Supp. 2d at 244–45 ("This standard of review is deferential, and [a court] may neither engage in [its] own fact-finding nor supplant the Town Board's reasonable determinations . . . ." (citations omitted); *Town of LaGrange*, 658 F. Supp. 2d at 554–55 ("The standard is a deferential one.").

### iii.  Article 78 Review Standard

The standard under Article 78 is "arbitrary and capricious" and "not supported by 'substantial evidence.'" *Town of Fenton*, 843 F. Supp. 2d at 242 (quoting N.Y. C.P.L.R. § 7803(3)–(4)); *see also Town of Islip*, 893 F. Supp. 2d at 373 (quoting N.Y. C.P.L.R. §§ 7803(3) and (4)).  Article 78 uses a similar standard to the TCA.  Courts have found that where lack of substantial evidence is established under TCA, the determination will also be arbitrary and capricious and lack substantial evidence under Article 78.  *Town of Islip*, 893 F. Supp. 2d at 373 ("Although 'Article 78 imposes its own requirement that local decisions be supported by substantial evidence' the test for relief from a zoning board's decision under Article 78 'is essentially the same as that under the TCA.'" (citations omitted)); *Town of Fenton*, 843 F. Supp.

2d at 253 (noting that TCA and Article 78 tests are essentially the same); *Vill. of Floral Park Bd. of Trs.*, 812 F. Supp. 2d at 166–67 (same); *MetroPCS N.Y.*, 764 F. Supp. 2d at 448–49 (same).

### b. Substantive Test Under New York Law

Wireless carriers are public utilities under New York law. *Omnipoint Commc'ns, Inc.*, 430 F.3d at 535; *see also T-Mobile Ne. LLC v. Inc. Vill. of E. Hills*, 779 F. Supp. 2d 256, 265 (E.D.N.Y. 2011); *Vill. of Floral Park Bd. of Trs.*, 812 F. Supp. 2d at 154. As a result, their application must be evaluated under the standard articulated by the Court of Appeals in *Consolidated Edison Co. v. Hoffman*, 43 N.Y.2d 598, 611 (1978). *Omnipoint Commc'ns, Inc.*, 430 F.3d 535 ("The applicable standard was articulated by the New York Court of Appeals in *Consolidated Edison Co. v. Hoffman*, which concerns the showing that a utility must make under New York law before a zoning board *may* grant a use variance."); *see also T-Mobile Ne.*, 779 F. Supp. 2d at 265; *Vill. of Floral Park Bd. of Trs.*, 812 F. Supp. 2d at 154.

"Under the *Consolidated Edison* 'public necessity' standard, a utility must show that (1) its new construction 'is a public necessity in that it is required to render safe and adequate service'; and (2) 'there are compelling reasons, economic or otherwise, which make it more feasible' to build a new facility than to use 'alternative sources of power such as may be provided by other facilities.'" *Omnipoint Commc'ns*, 430 F.3d at 535; *see Town of Islip*, 893 F. Supp. 2d at 355. In the context of a telecommunications company such as Plaintiff, this has been interpreted to mean that it must "demonstrate that there was a gap in cell service, and that building the proposed [facility] . . . was more feasible than other options." *Omnipoint Commc'ns*, 430 F.3d at 535. Put another way, Plaintiff must prove three elements: "a coverage gap, that the [proposed] [f]acility would remedy the coverage gap, and that the [proposed] [f]acility would have a negligible impact on the community." *Vill. of Floral Park Bd. of Trs.*,

812 F. Supp. 2d at 154–55; *Town of Islip*, 893 F. Supp. 2d at 355 (stating that "public necessity has been interpreted in the context of zoning decisions for wireless facilities to require that the telecommunications provider establish: [1] that there are gaps in service, [2] that the location of the proposed facility will remedy those gaps and [3] that the facility presents a minimal intrusion on the community." (quotation marks omitted) (quoting *Site Acquisitions, Inc. v. Town of New Scotland*, 770 N.Y.S.2d 157, 160 (App. Div. 2003)).

### c. Analysis

Plaintiff has satisfied the *Consolidated Edison* test. Plaintiff submitted evidence that (1) there was a gap in service, (2) that the proposed plan would remedy that gap, and (3) that the proposed facility was a minimal intrusion on the community. The Board's decision to the contrary is not substantiated by the record.

### i. Gap in Service

Plaintiff has established that there was a gap in wireless service. "[L]ocal governments must allow service providers to fill gaps in the ability of wireless telephones to have access to land-lines." *Town of LaGrange*, 658 F. Supp. 2d at 559 (quoting *Sprint Spectrum, L.P.*, 176 F.3d at 643); *see also Nextel of N.Y., Inc. v. City of Mount Vernon*, 361 F. Supp. 2d 336, 341 (S.D.N.Y. 2005) ("There is a public necessity when there is a service gap for a particular provider in a particular service area."). Plaintiff submitted evidence that there was a gap in service in a 2.06 square miles area, which includes Route 106, which services 27,267 cars a day. (R. 0013.) Plaintiff provided the expert testimony of Anthony West of C Squared Systems LLC, an RF engineer. (*Id.* at 0016–0017, 0030–0036.) West testified that in some of the covered area, calls could be made in some locations but that the service was not reliable. (*Id.* at 0035.)

In its decision, the Board discredited the testimony of West and questioned whether there was actually a gap in service. Specifically, the Board found that "the models used in [Plaintiff's expert] report [were] not an accurate representation of the service in the area and that the height of said Church [was] not suitable for providing seamless and reliable grade of service to the public." (R. 0010.) The Board reached its conclusion based on its "frequent[] passes" to the area and "its own analysis using cell service while in the area." (*Id.*) The Board's analysis was not discussed at the Hearing nor is it part of the record. Therefore, other than the expert testimony of West which supports Plaintiff's representation that there is a gap, the Board had no evidence before it to conclude otherwise.[6] The Board's conclusion which was based on its own test and analysis is unsupported by substantial evidence in the record and cannot be the basis of a denial of a special use permit. *Vill. of Floral Park Bd. of Trs.*, 812 F. Supp. 2d at 160–162 (holding that a zoning board may not rely on the absence of a specific type of evidence or neighbors lay opinion or even their own lay opinion of the existence of the gap but must provide substantial evidence to refute the plaintiff's expert reports that a service gap existed); *T-Mobile Ne.*, 779 F. Supp. 2d at 271–72 (finding that the board failed to provide substantial evidence that there was no gap in service to contradict "the reports and witnesses [T–Mobile] presented to the board[, which witnesses] testified to the existence of a clearly defined, tested, significant gap in service" in the record (alterations in original) (citations omitted)); *MetroPCS N.Y*, 764 F. Supp. 2d at

---

[6] There was testimony by several of the community members that they did not experience any problems with their Verizon Wireless coverage. (R. 0045–0051.) This is not substantial evidence upon which the Board may rely to reject expert evidence to the contrary. *N.Y. SMSA Ltd. P'ship v. Vill. Of Floral Park Bd. Of Trs.*, 812 F. Supp. 2d 143, 160–62 (E.D.N.Y. 2011) (holding that a zoning board may not rely on lay opinion that a gap in coverage does not exist); *see also T-Mobile Ne. LLC v. Inc. Vill. of E. Hills*, 779 F. Supp. 2d 256, 271–72 (E.D.N.Y. 2011) (unsupported opinion is not substantial evidence upon which a zoning board may rely); *MetroPCS N.Y., LLC v. Vill. of E. Hills*, 764 F. Supp. 2d 441, 454–55 (E.D.N.Y. 2011) (same).

454–55 (same).  Thus, Plaintiff has demonstrated that it did have a service gap, and, therefore, the need for a facility to remedy the gap.

### ii.   The Proposed Facility Would Remedy the Gap in Service

Plaintiff has also presented evidence that the gap in the service would be remedied by the proposed facility.  West testified that the gap would be remedied by the proposed facility at the church.  (R. 0030–0036.)  Plaintiff submitted the affidavit of Kuchenbord, discussing alternative sites, which provides sworn statements that the locations were identified in conjunction with an RF engineer to remedy the gap in the service.  (*See id.* at 0064–0070.)  In addition, Plaintiff provided the expert report authored by C Squared Systems which described and provided maps depicting the service gap and how the new tower would rectify the gap.  (*Id.* at 0212–0220.)  Because the Board determined that there was no gap in the service, it did not reach the question of whether the existing gap would be remedied by the proposed facility in the church.  However, substantial evidence in the record supports the conclusion that the gap in service would be remedied by the proposed facility.

### iii.   The Proposed Facility is a Minimal Intrusion on the Community

Plaintiff proposed a facility that was minimally intrusive on the community.  The antennas would be placed within the steeple of the church so that they would not be seen by the community.  (R. 0003.)  The heavy equipment would be placed inside the basement of the church, so that it too would not be visible to the community.  (*Id.* at 0003, 0016–0023.)  The only visible aspect of the proposed facility is the generator.  (*Id.*)  Plaintiff proposed painting the generator black to match the color of the roof of the church where it was to be located, to limit its visibility.  (*Id.*)  In addition, the facility was unmanned, and, thus, there would be no increased

traffic in the community, other than the periodic visits by an individual to service the facility every four to six weeks.  (*Id.* at 0022.)

The Board's additional considerations can be grouped into four categories under the minimally intrusive category: (1) the proposed facility would affect the aesthetics of the community; (2) the proposed facility would affect property values in the community; (3) Plaintiff failed to fully consider less intrusive alternatives; and (4) the impact of the proposed facility on the health and safety of the community.  For the reasons set forth below, the Court finds that the Board's decision to deny the application is not supported by substantial evidence and Plaintiff has met its burden of demonstrating that the application is minimally intrusive on the community.

### 1.  Aesthetics

The Board's aesthetic concerns are not supported by substantial evidence in the record, and, therefore, the Board's decision cannot be affirmed on this ground.  "[A]esthetics is a permissible ground for denial of a permit under the TCA."  *Omnipoint Commc'ns, Inc.*, 430 F.3d at 533; *see also Town of Islip*, 893 F. Supp. 2d at 356 ("[I]n New York, aesthetics can be a valid ground for local zoning decisions."  (alteration in original) (quoting *Cellular Tel. Co.*, 166 F.3d at 495)).  However, the aesthetic concerns must be grounded in substantial evidence in the record.  *Town of Islip*, 893 F. Supp. 2d at 356; *MetroPCS N.Y.*, 764 F. Supp. 2d at 449.  "Speculative concerns about the 'potential visibility' of a proposed tower are unlikely to constitute substantial evidence for denying an application absent some form of objective support in the form of 'photographs, site plans, surveys, and the like.'"  *Town of Islip*, 893 F. Supp. 2d at 358–59 (quoting *Green Mountain Realty Corp. v. Leonard*, 688 F.3d 40, 54 (1st Cir. 2012)); *see also Town of Fenton*, 843 F. Supp. 2d at 252–53 (N.D.N.Y. 2012) ("Although aesthetic impacts

may be a reasonable basis for denying an application for a wireless communications facility, such a denial must be based on more than just unsupported opinion."); *T-Mobile Ne.*, 779 F. Supp. 2d at 268 (holding that a zoning board must articulate more than "generalized" aesthetic concerns).

At the Hearing and in her expert report, Echeveria conceded that while the antenna could not be seen, the generator could be seen from some locations. (*Id.* at 0025.) This finding was corroborated by two expert reports: one report by VHB Engineering, Surveying and Landscape Architecture, P.C., and a second report by Creative Visual, a company that models installations prior to their placement — both of which stated that the generator would be visible from four out of the eight studied viewpoints. (*Id.* at 0285–0286, 0297.) Plaintiff's plan was to mitigate any effects of the generator by painting it black, the color of the church, and the expert analysis was that the generator "would not alter the essential visual character of the overall structure." (*Id.* at 0287.)

The Board determined that the design was not "stealth." (*Id.* at 0005.) The basis for this conclusion was not testimony given at the Hearing, or expert reports, or even letters from concerned neighbors. (*Id.*) Rather, this conclusion was based on a site visit by the Board that does not appear in the record. (*Id.*) The Board concluded, based on this site visit, that the design was not stealth.[7] (*Id.*) The Board is allowed to discount expert opinions, but it must rely on substantial evidence in the actual record in order to do so. *See New Town of Fenton*, 843 F. Supp. 2d at 252–53 (holding that unsupported opinion that the application would have a significant aesthetic impact was insufficient to overcome the plaintiff's expert's findings that the impact would be minimal); *MetroPCS N.Y.*, 764 F. Supp. 2d at 452–53 ("Although the ZBA is

---

[7] It is unclear what the Board observed at the site since the proposed facility has not been installed.

'not bound to accept [Metro's] expert testimony simply because . . . it was insufficiently contested by properly credentialed expert testimony,' '[a] few generalized concerns about a potential decrease in property values, especially in light of [ ] contradictory expert testimony, does not seem 'adequate to support a conclusion' that the permits should be denied.'"  (alteration in original) (quoting *Cellular Tel. Co.*, 166 F.3d at 496)); *Vill. of Floral Park Bd. of Trs.*, 812 F. Supp. 2d at 157–58 ("Viewing the record in its entirety, the Court finds that the Board's denial on the grounds that the Facility is 'not in keeping with the overall characteristics of the Village,' which ignored the expert testimony, technical reports, and data concluding that the Facility would blend in with . . . the surrounding neighborhood . . . is not supported by substantial evidence.").  The Board failed to rely on actual evidence in the record when making its determination that the generator was not stealth.

Given the lack of substantial evidence in the record to support the Board's aesthetics rationale, this concern is an insufficient basis for the denial of the special use permit.  *Town of Fenton*, 843 F. Supp. 2d at 252–53 (holding that "the administrative record clearly demonstrated that AT & T's proposed monopine would cause only a minimal intrusion on the community, and that the ZBA's conclusory finding to the contrary was not supported by substantial evidence"); *Vill. of Floral Park Bd. of Trs.*, 812 F. Supp. 2d at 157 ("Such objections are not a basis for denial insofar as a 'few generalized expressions of concern' about aesthetics by residents that are grounded in speculation about future facilities as opposed to direct critiques of the actual proposal 'cannot serve as substantial evidence on which the [Village] could base the denials.'" (quoting *Cellular Tel. Co.*, 166 F.3d at 496)); *T-Mobile Ne.*, 779 F. Supp. 2d at 268 (holding that "generalized" aesthetic objections that "failed to identify specific aesthetic problems that the [Proposed Facility] would create" were insufficient basis to deny the permit); *MetroPCS N.Y.*,

764 F. Supp. 2d at 451–52 (finding that the zoning boards' assertion that the application would have an aesthetic impact was not supported by substantial evidence where application required adding small structures to an existing building rather than erecting a new building). Here, an antenna that could not be seen, a generator that would have been three feet and eight inches above the roof of an existing building, painted black to match the color of the roof of the existing building, and which would have been visible from four of eight view points, does not support the Board's determination that the proposed facility was not "stealth."[8]

## 2. Property Values

The Board's determination that property values would be negatively affected by the facility is not supported by substantial evidence in the record, and therefore cannot be a basis to affirm its decision. The negative effect on property values can be considered by the Board and is a valid reason for the Board to deny an application for a use permit. *Omnipoint Commc'ns, Inc.*, 430 F.3d at 535. However, as with aesthetic concerns, the effect on property values must be supported by substantial evidence in the record. *T-Mobile Ne.*, 779 F. Supp. 2d at 269–70; *MetroPCS N.Y*, 764 F. Supp. 2d at 452–53.

Michael Lynch, a certified appraiser who had appeared before the Board many times and was recognized by the Board as a real estate expert, testified on behalf of Plaintiff about the effect, if any, the proposed facility would have on real estate values. (*Id.* 0016–0017, 0041–0044.) According to his testimony, there would be no impact on real estate property values

---

[8] As discussed in footnotes 1 and 6 above, the Board's finding that the generator would have extended five feet beyond the roof, and its finding based on its own observations that the roof of the church is not black, and the placement of the generator would not be "stealth," are not supported by the evidence in the record. In any event, even if true, they do not affect the Court's analysis. Even a generator protruding five feet beyond the roof could be stealth if painted the color of the roof and there is nothing that prevents the Board from granting the special use permit with the condition that the generator be painted the color of the roof.

because the wireless facility was concealed. (*Id.*) Lynch submitted an expert report stating the same. (*Id.* at 0152–0201.) His analysis was made based on the effect of a similar T-Mobile facility built in 2000 in a church located in East Norwich. (*Id.* at 0042–0044, *see also id.* at 0342–0348.)

The Board rejected Lynch's testimony and report and found that the proposed facility would affect property values. (*Id.* at 0006.) The Board stated that it found Lynch's report unpersuasive because "he [did] not support [the report] with any statistical data other than a similar application in Suffolk County that was installed over ten (10) years ago." (*Id.*) The Board also discounted Lynch's opinion that because the design was "stealth," prospective buyers would be unaware of its presence. (*Id.*) The Board stated that it could not "rely on 'what-ifs' when rendering its decision." (*Id.*) The Board also stated that "there should not be an assumption made in any analysis that because a 'prospective buyer' may or may not see it, it will not know it is there and therefore it will not affect values." (*Id.*)

There is no substantial evidence in the record that buyers are known to have decided not to buy a property when it was located next to a wireless facility. The Board may not simply discount an expert's opinion and decide that property values would be affected without substantial evidence in the record to support its contrary findings. *See, e.g.*, *Vill. of Floral Park Bd. of Trs.*, 812 F. Supp. 2d at 157 ("[A]lthough a few residents raised concerns about property values, these were simply conclusory assertions that property values would decrease, which do not amount to substantial evidence."); *T-Mobile Ne.*, 779 F. Supp. 2d at 269–70 (finding that, while the zoning board was not bound to credit the plaintiff's expert on property values, any decision that there would be a negative effect on property values had to be supported by substantial evidence and that the zoning board had failed to do so and instead relied on a "few

generalized concerns"); *MetroPCS N.Y.*, 764 F. Supp. 2d at 452–53 ("[a] few generalized concerns about a potential decrease in property values, especially in light of [ ] contradictory expert testimony, does not seem 'adequate to support a conclusion' that the permits should be denied." (alteration in original) (quoting *Cellular Tel. Co.*, 166 F.3d at 496))).

### 3. Alternative Sites

There is no substantial evidence to support the Board's assertion that Plaintiff failed to conduct due diligence to find an alternative site. The Board's decision cannot be affirmed on this ground. As part of the public necessity test, a zoning board must consider whether there is a more feasible option that would be less intrusive on the community. *Vill. of Floral Park Bd. of Trs.*, 812 F. Supp. 2d at 164–65 ("A local board is justified in considering the availability of alternatives that might create less disruption to the community's zoning plan." (alterations omitted)); *N.Y. SMSA L.P. v. Town of Oyster Bay Zoning Bd. of Appeals*, No. 08-CV-4833, 2010 WL 3937277, at *6 (E.D.N.Y. Sept. 30, 2010) (same). "A local government may reject an application for construction of a wireless service facility in an under-served area without thereby prohibiting personal wireless service if the service gap can be closed by less intrusive means." *Sprint Spectrum L.P.*, 176 F.3d at 643; *see also Omnipoint Commc'ns*, 430 F.3d at 536 (finding that the board's denial was merited because the plaintiff "identified several other potential sites but stated in conclusory fashion that they were unfeasible" and "stated (without documentation) that it was unable to build a less intrusive structure or combination of structures"). "[T]he Court must ascertain whether there is substantial evidence to support the Board's finding that alternative sites were not investigated properly, based on evaluation of the entire record, including opposing evidence." *Town of Oyster Bay Zoning Bd. of Appeals*, 2010 WL 3937277, at *6; *N.Y. SMSA Ltd. P'ship v. Inc. Vill. of Mineola*, No. 01-CV-8211, 2003 WL 25787525, at

*9 (E.D.N.Y. Mar. 26, 2003) (the court must look at the whole record to determine if "there is substantial evidence to support the Board's finding that alternative sites were not investigated properly").

To support its assertion that alternative locations were not feasible, Plaintiff's counsel testified to alternative locations and Plaintiff submitted two expert reports. The expert reports discussed eight alternative locations, six of which either would not remedy the gap or had restrictions on use that would preclude the facility, and two of which Plaintiff was never able to get in touch with the owner of the properties. (R. 0036–0040, 0064–0149, 0204–0211.) Two alternative locations of particular interest to the Board were Rothman's Steakhouse and East Norwich Inn. (*Id.* at 0011.) Plaintiff's counsel testified at the Hearing that the landlord for Rothmann's Steakhouse "was not interested," but did not provide any details as to why the landlord was not interested. (*Id.* at 0038.) In Kuchenbord's affidavit concerning alternative sites, he states that Rothmann Steakhouse and East Norwich Inn were under common ownership. (*Id.* at 0067.) He forwarded correspondences to "a representative of Rothmann's and the East Norwich Inn" during May 2008 and on November 24, 2010 and he received no response. (*Id.*) Kuchenbord's November 24, 2010 letter indicates that Kuchenbord also attempted a few visits at both locations and he was informed that the representative was unavailable.[9] (*Id.* at 0078.)

A plaintiff need not evaluate every potential alternative in order to demonstrate that its proposal meets the least restrictive means test. *Vill. of Floral Park Bd. of Trs.*, 812 F. Supp. 2d at 166 ("[T]here is no requirement in the Code that Verizon evaluate every potential location where the Facility hypothetically could be constructed, and submit evidence showing why each

---

[9] Plaintiff's Radio Frequency Engineer, Anthony Wells, only reviewed some of the same locations as Kuchenbord for their ability to remedy the gap. (R. at 0204–0211.) The locations reviewed did not include Rothmann's Steakhouse or East Norwich Inn. (*Id.*)

site is not a viable alternative.").  The law only requires a plaintiff to engage in "a good faith effort to evaluate alternative sites."  *Vill. of Floral Park Bd. of Trs.*, 812 F. Supp. 2d at 165 ("Although the Board questioned why Verizon did not spend a 'million dollars' trying to change the minds of these property owners rather than seeking a special use permit for the Property, the Board did not present any evidence that either of these sites were feasible substitutes."); *Town of Oyster Bay Zoning Bd. of Appeals*, 2010 WL 3937277, at *6 (finding the plaintiff's "good-faith justifications for why all other sites . . . would not substitute for the Property" including the fact that one alternative site wanted the ability to terminate the agreement without cause was sufficient to show that there were no other feasible alternatives); *Inc. Vill. of Mineola*, 2003 WL 25787525, at *9 (finding the expert's testimony that an alternative site was "disinterest[ed]" was sufficient to find that it was not a feasible alternative, especially when "[t]he [b]oard did not request any additional evidence from either [the expert] or Verizon regarding the availability of the site throughout the two public hearings").

In its decision, the Board focused on the fact that of the eight alternative sites studied, "two of those sites . . . namely, Rothmann's Steakhouse and the East Norwich Inn, the Applicant did not meet or schedule an appointment with the owner."  (R. 0011.)  The Board expressed its opinion that the "Rothmann's Steakhouse" site would have been "more ideal as it is located in a much more commercially oriented area" and "it would have more than satisfied the height requirements."  (*Id.*)  At oral argument, and in supplemental filings, Defendants assert that there were two other alternative locations in the same intersection not considered by Plaintiff. [10]  (*See*

_____

[10]  At oral argument the Court requested additional *legal* briefing from both parties on the issue of Plaintiff's obligation to investigate alternative sites.  (*See* Minute Entry for July 13, 2013).  In their filing, Defendants conceded that they had no further case law on the issue of alternatives to present to the Court and instead raised facts that were not a part of the record.  (Docket Entry No. 27.)  As the Court explained at oral argument and *infra*, the Court may only

Docket Entry No. 27.)  Other than speculation that the alternatives were more appropriate and Plaintiff should have tried harder, the Board presented no evidence that the other sites were feasible or appropriate alternatives.  The Board is required to support its decision with substantial evidence that the alternative sites were feasible.  *Town of Oyster Bay Zoning Bd. of Appeals*, 2010 WL 3937277, at *6 (noting that "[t]he Board presented *no evidence* that other sites were appropriate substitutes for the Property" and that the plaintiff had clearly explained that the alternative site preferred by the board was not feasible because the plaintiff was unable to come to agreeable lease terms with the owner of the property (emphasis in original)); *see also Inc. Vill. of Mineola*, 2003 WL 25787525, at *9 ("Verizon met its burden of investigating alternatives and presented credible evidence regarding the infeasibility of the sites and the Board presented no evidence to the contrary.").  Here, Plaintiff presented evidence that the other alternatives that it did investigate were not feasible and that despite at least two attempts to reach the owner of Rothmann's Steakhouse and East Norwich Inn, it was unable to do so.  The Board's finding that one of those two locations would have been "more ideal" is not supported by substantial evidence in the record, nor is its finding that Plaintiff failed to conduct due diligence to find a less intrusive alternative site.

### 4.  Health and Safety Concerns

Plaintiff asserts that the Board may have been improperly swayed by public concern for health and safety, but there is no indication in the record that the Board was unduly swayed by

---

consider evidence in the record and explicitly referenced in the Board's decision.  *New Cingular Wireless PCS, LLC v. Town of Fenton*, 843 F. Supp. 2d 236, 246–47 (N.D.N.Y. 2012) ("[A] post hoc rationalization . . . cannot . . . be raised to defend" a zoning board's decision before a federal court.); *see also T-Mobile Ne. LLC v. Town of Islip*, 893 F. Supp. 2d 338, 367 (E.D.N.Y. 2012) ("A board may not provide the applicant with one reason for a denial and then, in court, seek to uphold its decision on different grounds." (citations omitted)).

health and safety concerns.  (Pl. Mem. 12–13.)  Under the law, a zoning board in rendering a decision may not consider community concerns that wireless emissions may affect the health of the community and the environment when the emissions are within FCC emission regulation levels.  *Town of Islip*, 893 F. Supp. 2d at 353 ("The TCA expressly prohibits a local zoning board from denying an application that is otherwise compliant with FCC emissions regulations on the basis of the environmental effects of radio frequency emissions.  Environmental effects within the meaning of the provision include health concerns about the biological effects of RF radiation." (citations and internal quotation marks omitted)); *Vill. of Floral Park Bd. of Trs.*, 812 F. Supp. 2d at 157 ("[T]he TCA expressly prohibits a local zoning board from denying an application that is otherwise compliant with FCC emissions regulations 'on the basis of the environmental effects of radio frequency emissions.'" (quoting 47 U.S.C. § 332(c)(7)(B)(iv)); *Town of LaGrange*, 658 F. Supp. 2d at 554 ("[M]ost of the record consists of comments from the public — some of which concerned matters that the ZBA was not legally permitted to consider, including the purported negative health effects from emissions from the cell tower."); *Nextel of N.Y., Inc. v. City of Mount Vernon*, 361 F. Supp. 2d 336, 341 (S.D.N.Y. 2005) ("[H]ealth concerns expressed by residents cannot constitute substantial evidence.").

The Board stated at the Hearing and in its decision that it was aware that it could not consider health concerns.  (*See* R. 0009, 0046–0047.)  In its decision, the Board specifically stated that "the Board cannot consider the impact of the radio frequency emissions if they are within the safety criteria of the Federal Communications Commission in the Telecommunications Act of 1996."  (*Id.* at 0009.)  "[T]he mere fact that members of the community raised health concerns does not violate the TCA."  *Town of Islip*, 893 F. Supp. 2d at 353–54 (citing *Cellular Tel. Co*, 166 F.3d at 495)); *see also MetroPCS N.Y.*, 764 F. Supp. 2d at

448 ("Articulating concerns about the health consequences of proposed facilities is permitted, however 'when the testimony is almost exclusively directed to health effects, there must be substantial evidence of some legitimate reason for rejecting the applications to avoid the conclusion that the denials were based on the impermissible health effects ground.'").  There is no indication that the Board was ultimately persuaded by health and safety concerns, and the Court finds that Plaintiff's claim that it was is without merit.

Plaintiff has met the *Consolidated Edison* test by illustrating that there was a gap in service, the facility would remedy the gap and the facility was minimally intrusive on the community, and, therefore, the use permit should be issued.  The Board's opinion to the contrary is not supported by substantial evidence in the record.

### d.   The Board's Decision Was Arbitrary and Capricious

As discussed above in the Article 78 standard section, the substantial evidence standard under the TCA and the "arbitrary and capricious" and "not supported by substantial evidence" standard under Article 78 are the same.  *Town of Fenton*, 843 F. Supp. 2d at 253 (noting that TCA and Article 78 tests are essentially the same); *Vill. of Floral Park Bd. of Trs.*, 812 F. Supp. 2d at 166–67 (same); *MetroPCS N.Y.*, 764 F. Supp. 2d at 448–49 (same).  As with TCA cases, judgment should be made in favor of a plaintiff under Article 78 if the plaintiff meets the *Consolidated Edison* test.  *Cellular Tel. Co. v. Rosenberg*, 82 N.Y.2d 364, 371–74 (1993) (holding that wireless carriers are public utilities under New York law and therefore their Article 78 claims should be analyzed under the *Consolidated Edison* test); *see also Town of Fenton*, 843 F. Supp. 2d at 253 (applying *Consolidated Edison* test to both TCA and Article 78 cases).

The Court finds that Plaintiff has shown that there was substantial evidence under the TCA to support its application and that the Board's decision lacked substantial evidence, the

Court also finds that the Board's decision lacks substantial evidence and was arbitrary and capricious under the Article 78 standard. Plaintiff's motion for summary judgment is therefore granted. *Vill. of Floral Park Bd. of Trs.*, 812 F. Supp. 2d at 166–67 ("Having found that the Board's denial not only was not supported by substantial evidence under the TCA, but also was primarily based on considerations that had no basis in the Code or the applicable state law, the Court finds that the denial was also unsupported by substantial evidence and arbitrary and capricious in violation of Article 78."); *cf. Town of Islip*, 893 F. Supp. 2d at 373 ("Having found that the Board's denial was supported by substantial evidence under the TCA and applicable state and local law, the Court finds that the denial was also supported by substantial evidence and was not arbitrary and capricious in violation of Article 78.").

### e. The Board Is Instructed to Grant the Special Use Permit

As discussed above, a plaintiff meets its burden when it demonstrates that there is a gap in service, the solution would remedy the gap and the proposed facility is minimally intrusive on the community. (*See supra* Part II.d.). Also, as discussed above, Plaintiff has met its burden by demonstrating a gap in service, that the proposed facility would remedy the gap, and that the proposed facility would have minimal impact on the community. Therefore, Plaintiff's request for injunctive relief is granted, and the Board is instructed to issue the use permit. *See T-Mobile Ne.*, 779 F. Supp. 2d at 275 ("Although the TCA 'does not specify a remedy for violations of the cellular siting subsection,' . . . 'the majority of district courts that have heard these cases have held that the appropriate remedy is injunctive relief in the form of an order to issue the relevant permits.'" (quoting *Cellular Tel. Co.*, 166 F.3d at 497 (collecting cases)); *Town of Fenton*, 843 F. Supp. 2d at 258 (courts have customarily granted injunctive relief and required the zoning board to issue necessary variances and permits); *Inc. Vill. of Mineola*, 2003 WL 25787525, at *11 ("In

order to facilitate the TCA's goals of expediting resolution of the issues presented herein, the Court finds injunctive relief is the appropriate remedy.").[11]

## III. Conclusion

For the reasons set forth above, Plaintiff's motion is granted. Defendants are ordered to issue a special use permit to Plaintiff. The Clerk of Court is directed to close this case.

SO ORDERED:

___s/MKB_____
MARGO K. BRODIE
United States District Judge

Dated:  August 16, 2013
        Brooklyn, New York

---

[11] Defendants in their opposition and at oral argument assert that the Board had to deny the special use permit because the Board had no authority to grant the permit since special use permits could not be granted for the particular residential zone where the church is located. (Defs. Opp'n 1–2.) Plaintiff argues that even if it had to obtain a variance before getting the special use permit, with Board approval, it could build a cellphone tower in the zone. (Pl. Reply 1–2.) The record is clear that at no time did the Board question whether it had the authority to issue a special use permit to Plaintiff. (*See generally* R. 0003–0010.) Nor did the Board question its ability to grant these types of special use permits generally in this zone. (*Id.*) The Court may only decide the current motion based on the Board's decision and the record before the Board. All the reasons to deny the permit must be explicitly articulated in the written opinion "so that no one has to parse a record and guess which of the things mentioned therein was ultimately found persuasive." *Omnipoint Commc'ns, Inc. v. Town of LaGrange*, 658 F. Supp. 2d 539, 554 (S.D.N.Y. 2009); *see also Town of Fenton*, 843 F. Supp. 2d at 246–47 (citing *Town of LaGrange* for the proposition that the rationale for the denial must be clear from the zoning board's decision). "[A] *post hoc* rationalization . . . cannot . . . be raised to defend" a zoning board's decision before a federal court. *Town of Fenton*, 843 F. Supp. 2d at 246–47; *see also Town of Islip*, 893 F. Supp. 2d at 367 ("A board may not provide the applicant with one reason for a denial and then, in court, seek to uphold its decision on different grounds." (citations omitted)); *Vill. of Floral Park Bd. of Trs.*, 812 F. Supp. 2d at 156 (noting that "a post-hoc rationale offered for the first time in litigation" should not be considered substantial evidence to support a zoning board's decision); *Nextel of N.Y., Inc. v. City of Mount Vernon*, 361 F. Supp. 2d 336, 342 (S.D.N.Y. 2005) (holding that "considerations were not mentioned in the City's written decisions . . . cannot be raised" in the federal litigation). The Court will not address the merits of Defendants' assertion, as it is not properly before the Court.